IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KEITH L. HENDERSON,

       Plaintiff,

vs.                                    No. CIV 09-356 MCA/LFG

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

       Defendant.

MAGISTRATE JUDGE'S FINDINGS
AND RECOMMENDED DISPOSITION[1]

I.    FINDINGS:

On August 16, 2006, Plaintiff Keith Henderson ("Henderson") filed an application for supplemental security income ("SSI") benefits. [AR 13, 115.]  Henderson's application was denied at both the initial and reconsideration levels. [AR 13, 29, 30, 31, 41.] On July 16, 2007, Henderson requested an ALJ hearing, alleging he could not work because of his medical problems.  [AR 39.] On June 12, 2008, the ALJ held a hearing [AR 219], and on September 2, 2008, the ALJ issued a decision finding that Henderson was not entitled to SSI benefits. [AR 10-19.] On February 11, 2009, the Appeals Council denied Henderson's request for review, after considering additional evidence

---

[1]**Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.**

submitted by Henderson. [AR 3-4, 6.]  On April 13, 2009, Henderson filed a Motion to Reverse or Remand Administrative Agency Decision. [Doc. Nos. 14, 15.]  The Commissioner filed a response to Henderson's Motion [Doc. 16], and Henderson filed a reply [Doc. 21].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court recommends that Henderson's motion to reverse be granted and that this matter be remanded for the reasons stated below.

## General Background

Henderson alleges he is disabled and unable to work because of bipolar disorder and depression, which he first became aware of on January 1, 1983. [AR 41, 110.] Thus, he sets out an onset date of 1/1/83.

Henderson was born on October 5, 1965 [AR 115] and was 42 years old at the time of the ALJ hearing. [AR 222.] He graduated from high school and had about three years of college education when the ALJ hearing was held. [AR 177, 222.] He hoped to obtain his degree in Graphic Approaches to Education by May 2009, and planned to use his degree to design textbooks and websites. [AR 177, 222.] Henderson had some vocational training in commercial printing. [AR 113.]

Henderson's job history is spotty. [AR 83-85, 179.] He last worked part-time as a delivery driver for a printing company for four months in 2000. [AR 100, 227.]  His longest held job was as a jewelry grinder and polisher in a jewelry manufacturing factory from about 1990 through 1994. [AR 12, 85, 179.] Although Henderson held this job for about five years, he stated he only worked 25 hours a week.  [AR 12, 179, 229.]  However, the ALJ noted his earnings then exceeded that of "significant gainful activity." [AR 19, 51.]

Henderson does not have a significant earnings record.  From 1987-1990, he made from $3,000 to $9,000; between 1991- 1992, approximately $10,000 to $11,000, and in 1993-1996, about

$2,000 to $9,000. Henderson earned very little in 1997 and 1998, and had no earnings in 1999. In 2000, Henderson earned $3240. There are no earnings recorded after 2000. [AR 51.]

Henderson has been married since 1999. [AR 179.] His wife has been diagnosed with deafness and bipolar I and receives SSI. [AR 177-79.] Henderson's son was about 12 years old at the time of the ALJ hearing. [AR 67, 177.] The son has been diagnosed with ADHD (attention deficit hyperactivity disorder) and early onset bipolar disorder. [AR 178.]

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

3

1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[8] age, education and past work experience, he is capable of performing other work.[9]

Here, the ALJ made his decision at step four of the sequential evaluation, concluding that Henderson's RFC did not preclude him from performing past relevant work. [AR 19.]

### Standard of Review

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails

---

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of the entire record" [AR 15], the ALJ denied Henderson's request for benefits. [AR 19.] The ALJ determined that Henderson had not engaged in substantial gainful activity since August 16, 2006, the application date; had severe impairments consisting of bipolar affective disorder and a personality disorder with dependent and avoidant traits; did not have any impairment or combination of impairments that met or medically equaled a listing impairment; and had the RFC to perform a limited range of work at all exertional levels requiring minimal contact with the public, coworkers and supervisors, and not requiring extended periods of attention and concentration without short breaks. [AR 16-17.] In so finding, the ALJ decided that Henderson's impairments could reasonably be expected to produce some of the alleged symptoms

but that his statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely credible. [AR 18.]

At step four, the ALJ decided that Henderson's RFC did not preclude him from performing his past relevant work as a jewelry manufacturing grinder and polisher. [AR 19.] Thus, the ALJ determined that Henderson was not under a disability as defined by the SSA from the application date of August 16, 2006. [AR 19.]

**Medical History/Background**

**_2006 Records_**

As of 2006, Henderson was regularly seeing both Dr. E.B. Hall,[10] a psychiatrist, and Susan Flynn ("Flynn"), a therapist.  On January 8, 2006, Henderson told Dr. Hall that he had been unable to get out of bed.  He was depressed in part because he was unable to get into school.[11]  He was feeling suicidal that day, cried in the session, and felt "like a blanket was over [him]."  He was having bad dreams about his father and insomnia.  Henderson was taking Trileptal[12] which helped with his sleep.  He also took Lamictal[13] which made him feel "spacy" and gave him a tic in his eye. Dr. Hall considered adding an antidepressant to Henderson's medication regimen. [AR 135.]

---

[10]Dr. Hall's handwritten medical progress notes are not always legible.  *See, e.g.,* AR 135, 143.

[11]The doctor's handwriting is unclear as to whether Henderson could not attend school or was not accepted into school at this time.

[12]Trileptal is used to treat seizure disorders (epilepsy). It may be used with other seizure medications. www.webmd.com

[13]Lamictal or "Lamotrigine is used alone or with other medications to prevent or control seizures (epilepsy) in people aged 2 and older.  It may also be used to help prevent the extreme mood swings of bipolar disorder in people aged 18 and older.  This medication is an anticonvulsant.  Lamotrigine is thought to work by restoring the balance of certain natural substances (neurotransmitters) in the brain.  www.webmd.com

On April 6, 2006, Henderson saw Flynn. Henderson reported he was "unable to cope" and was "hiding in bed." He "fell apart" last week when he was trying to write a paper that was due that day and his wife needed his attention. He did not write the paper and "collapsed." [AR 198.] He had a history of collapses, drug abuse since age 12, and underachievement. Henderson was anxious. [AR 198.] Flynn hoped to have Henderson resolve the school situation by taking an "incomplete" on his unfinished paper. On April 13, 2006, Henderson told Flynn he was tired of his wife not helping him and of her being too needy. [AR 198.] Henderson was a "no-show" for his therapy appointment on April 20. [AR 198.]

On April 27, 2006, Henderson told Flynn that he felt despair from April 20-April 24, but had felt the "happiest ever" from April 25 to today. He connected the change to great improvement in relations with his wife. Henderson discussed a history of violence by his father and others along with episodes of happiness. He moved rapidly from topic to topic. Flynn observed that Henderson's feelings of despair and happiness appeared "out of the blue" to Henderson as did punishments by parental and authority figures. Flynn was not certain if Henderson could connect a sense of "self" to "these others and these arbitrary events." [AR 197.]

On May 2, 2006, Henderson saw Dr. Hall. This is the most extensive handwritten progress note by Dr. Hall, but it is partially illegible. [AR 143-46.] Henderson reported severe recurrent depression since 1983, and cyclical depression once or twice a year. In 1987, he remembered he "held up" for a month in his motel room. His depression had increased "bit by bit" since his father's death 2½ years ago. Henderson's mother was opposed to medication. Several weeks earlier, Henderson had been sleeping 14 hours a day and could not get out of bed. [AR 143.] He apparently was attending Technical Vocational Institute ("TVI," now Central New Mexico Community College) and had achieved a GPA of 3.9. This term, however, he "washed out." Henderson had

7

moments when he felt miserable, fatigued, hopeless, helpless and suicidal.  Dr. Hall noted suicidal ideation and that Henderson had no plan or prior attempts.  When Henderson was in a depressive state he could not focus on his wife's disability ("BPD/DBD, OCD") or his 11-year old son. [AR 143.]

Henderson reported a family history of depression and of physical/verbal abuse.  His father was an alcoholic.  His mother's career took a "nose dive."  Henderson's mood/affect were even and sad, but not despairing.  Playing the guitar could elevate his mood. [AR 145.] Occasional marijuana use is noted in this record.  Henderson was homeless in 1983 and kicked out of his house in 1985.  A number of illegal drugs are recorded, including Ecstacy, PCP, stimulants, and methamphetamine.  Qualudes calmed Henderson the most.  Henderson suffered from migraines all of his life. [AR 145.] Henderson stated there were moments when he felt like he was being groomed to be the "antichrist."  There were other periods when Henderson accomplished more, for example, writing a story and writing a paper. [AR 145.] Henderson's depression "sucked so much energy out of me."  Dr. Hall assessed Henderson with a mood disorder. [AR 146.]

On May 4, 2006, Henderson saw Flynn.  He reported that Dr. Hall had prescribed something for depression, but he did not have the name of the antidepressant.  Henderson did not feel supported in his wife.  He hoped to finish a University of New Mexico ("UNM") course for this semester. [AR 197.] On May 11, 2006, Henderson told Flynn that Dr. Hall increased the Lamictal.  He had completed his UNM assignment.  He was worried about money.  The therapist noted that it did not seem Henderson could see how to move from his current state to a job in the future.  He needed to be grounded in tasks of creating a life and a job. [AR 196.]

On May 11, 2006, Dr. Hall noted that Henderson's medications were more balanced.  Henderson was less depressed and not "spiraling down."  His relations with his wife were going

well.  The assessment was mood disorder. [AR 146.] On May 18, 2006, Henderson reported 3 to 4

days of hypomania[14] and increased energy.  He came out of the manic cycle and had started to feel

good.  His wife noted some stabilization of his symptoms.  Dr. Hall wanted to consider Lithium.

[AR 209.] Also on May 18, 2006, Henderson told Flynn that Dr. Hall increased his Lamictal.  He

was diagnosed with bipolar II disorder.[15]  Henderson was not clear about his manic episodes and was

worried about the costs of the prescription medications.  He was able to discuss jobs and the future

calmly and appeared less depressed with more energy. [AR 196.]

On June 1, 2006, Henderson had appointments with both Dr. Hall and Flynn.  Henderson

reported to Dr. Hall that he had a moment of depression but "came out of it."  He still felt "spaced

out." [AR 141.] Henderson told Flynn that his medications seemed to be working.  He had some

depression and appeared more energetic and hopeful. [AR 196.] On June 8, 2006, Henderson

discussed with Flynn his worries about work, money, and costs of mental health care.  [AR 195.]

By June 15, 2006, he told Flynn that he had experienced some bad episodes.  He expected the

medications to lift his mood more. [AR 195.] On June 22, 2006, he told Flynn that he was depressed

for a short time but was able to relate it to feeling a lack of support for his career goals.  Henderson

seemed to grasp that hard work was necessary to get through school and to achieve his goals, but

---

[14]"Bipolar mania, hypomania, and depression are symptoms of bipolar disorder. The dramatic mood swings
of bipolar disorder do not follow a set pattern. Depression does not always follow mania. A person may experience
the same mood state several times -- for weeks, months, even years at a time -- before suddenly having the opposite
mood. Also, the severity of mood phases can differ from person to person.  Hypomania is a less severe form of
mania. Hypomania is a mood that many don't perceive as a problem. It actually may feel pretty good. You have a
greater sense of well-being and productivity. However, for someone with bipolar disorder, hypomania can evolve
into mania -- or can switch into serious depression."  www.webmd.com

[15]"Bipolar II disorder . . . is a form of mental illness. Bipolar II is similar to bipolar I disorder, with moods
cycling between high and low over time.  However, in bipolar II disorder, the 'up' moods never reach full-on mania.
The less-intense elevated moods in bipolar II disorder are called hypomanic episodes, or hypomania.  A person
affected by bipolar II disorder has had at least one hypomanic episode in life. Most people with bipolar II disorder
also suffer from episodes of depression. This is where the term "manic depression" comes from.  In between
episodes of hypomania and depression, many people with bipolar II disorder live normal lives."  www.webmd.com

Flynn wondered if this was "grandiosity" or self confidence and hope. [AR 195.]  On June 29, Henderson reported to Flynn that he was working and earning money at odd jobs.  He felt melancholic but had not been fully depressed.  He showed more energy and ability to discuss issues. [AR 194.]

On July 13, 2006, Henderson noted moments of sadness but was able to move on.  The support group and medications helped him.  He was working on the UNM process. [AR 194.] On July 20, 2006, Henderson saw both Dr. Hall and Flynn.  He was doing better but still had moments of sadness.  He was not falling "into a deep funk but was reluctantly hopeful." [AR 140.]  Henderson told Flynn that Dr. Hall had given him a book on bipolar I and II disorder and that Henderson was taken with the "special powers idea."  He reported a history of visionary thinking to Flynn. [AR 193.]

On July 27, 2006, Henderson arrived for his appointment with Flynn one hour early.  He was in distress and reported his wife had kicked him out.  He was upset over the car and financial issues. He felt worthless and hopeless.  He denied being actively suicidal but he "wishes he were not here." He was calmer by the end of the session. [AR 193.] By that evening, he was at home and feeling less hopeless. [AR 192.] On August 3, 2006, he told Flynn he was free of his sad/hopeless mood from the week before but was not sure why.  He discussed intellectual issues during this session.  He denied any suicidal ideation.  Henderson was trying to get admitted to UNM.  [AR 192.] On August 10, 2006, Henderson was very talkative and feeling energetic.  He discussed hypomania as good energy vs. mania as excessive.  He was learning moods did not last forever and was trying to recall their various states. [AR 191.]

On August 16, 2006, Henderson submitted his application for SSI benefits, alleging an onset date of January 1, 1983. [AR 13.] During a face-to-face interview with disability services, the

interviewer noted that Henderson had problems concentrating and seeing.  His concentration was noted as "non-functional."  He spoke very fast and seemed nervous.  His spouse, who was present with him, mentioned his suicide attempts and he became irate with her and did not want to discuss the issue. [AR 116.]

On August 24, 2006, Henderson saw Flynn.  UNM had not allowed him to register yet, but he was optimistic and willing to "fight for it."  His mood was better and his confidence was "up."  He denied any suicidal ideation. [AR 191.]

There is an undated noted by Dr. Hall that may be from August or September 2006.  [AR 139.] Dr. Hall wrote that Henderson had been successfully free of a depressive episode for three months.  He was on a stable medication regimen and his outlook was positive.  He had developed coping strategies for recognizing and dealing with depression.  "Henderson feels confident that he can resume a normal academic load."  Dr. Hall noted that Henderson had been untreated and undiagnosed for 23 years. [AR 139.]

On August 31, 2006, Henderson told Flynn that UNM did not allow him to enroll.  He was frustrated but not angry.  He discussed past "nose dives" that would come and go.  He felt "even" now but below "the water line."  His mood appeared flat.  He seemed to be functioning and had applied for disability to keep his health benefits.  Henderson assumed he would be at UNM by the spring semester. [AR 190.]

On September 1, 2006, Henderson told Dr. Hall that he had been denied admission to UNM but that he was not going to let them "beat him."  He owed $6,000 but was never on academic probation.  He felt he was ready.  This progress note is illegible in part. [AR 138.] On September 7, 2006, Henderson told Flynn that he had had a bad week.  He reported fear of collapsing into darkness but so far, had not.  He wanted control of his life.  He discussed his family history and

generations of abuse by men. [AR 190.] On September 14, 2006, Henderson discussed the third anniversary of his father's death, although the note is not entirely clear.  He discussed his depression and thought treatment had helped him.  He seemed less depressed. [AR 189.]

On September 22, 2006, Henderson saw Dr. Hall.  The note is difficult to read but mentions suicide risk, BP II, family coping skills. [AR 137.] "Sad, unhappy background."  "Ups and downs but not dramatic."  "Occ - suicidal - fleeting moment . . . ."  Dr. Hall prescribed Abilify (antidepressant) and noted "Applic Disability." [AR 137.] On September 29, 2006, Dr. Hall wrote "no dark thoughts - occasional eyes tic" "No longer suicidal.  Mood is level."  Dr. Hall also wrote "need 1 year of stability."  "Advocate for 6 months/1 year stabilization before release to return to work." [AR 137.]

On October 3, 2006, Henderson told Flynn that Abilify caused intense headaches so he stopped taking it.  Henderson discussed his life and plans for the future.  He was glad to function and to "give up his epiphanies that he used to enjoy."  He appeared less depressed because of the medications. [AR 189.] Flynn wrote: "What will he do if he does not get admitted back into UNM?" On October 17, 2006, Henderson reported to Flynn that UNM agreed he could return in January and obtain financial aid.  His mood was leveling out and he was ok.  He missed creativity, ideas, and energy but he was relieved not to collapse.  He credited Dr. Hall and the medications for his mood improvement. [AR 188.] Flynn told Henderson that she was leaving her practice; he agreed to see a new therapist.  Flynn found Henderson less depressed and more self aware. [AR 188.]

On October 24, 2006, Henderson told Flynn he was depressed and felt like he was "walking through slush."  He wondered if he felt badly because friends used him for odd jobs and did not pay him well or fairly.  He worried about his future, money and work.  His self confidence had increased

12

and he was able to work on issues in treatment sessions.  Henderson would begin to work with a new therapist, Melissa Zellner ("Zellner"). [AR 187.]

On November 6, 2006, Henderson met with Zellner.  He was moderately depressed but felt as though the medications and other coping methods prevented him from "crashing."  He discussed his history and mentioned not loving himself. [AR 186.] On November 16, he told Zellner that he was depressed because he learned that a good friend was accused of molesting his ex-girlfriend's daughter.  Henderson felt like he wanted to move forward in his life but that this issue continued to arise.  He could not forgive his father because he could not put this issue behind him. [AR 186.]

On November 22, 2006, Henderson told Dr. Hall it had been a rough month and not totally level.  There were no high points, but Lamictal helped with his depression.  He was mostly stable.  He was grieving and mourning the loss of his father. [AR 136.] On November 30, Zellner found Henderson looked happy and upbeat.  He was smiling and laughing.  He reported he felt great and had had a good holiday with his family. [AR 185.] On December 7, 2006, Henderson  still felt good generally. [AR 185.] On December 14, 2006, he presented as severely depressed.  He reported he was extremely tempted to look at pornography on the internet but resisted the temptation.  Henderson felt like a failure because he did not have a job and could not get into school. [AR 185.]

There is an undated work background form indicating Henderson was in a work study program at TVI in 2001-2003.  He worked at a printing press for several months in 2000.  He stated that Dr. Hall diagnosed him with bipolar II disorder.  Even with medications, Henderson would need to deal with manic depressive and mixed states on an ongoing basis. [AR 59-61.]

### *2007 Records*

Henderson saw Dr. Hall on January 12, 2007.  His sleep was much improved, and he was able to sleep 4 to 8 hours a night.  There is a note to UNM Financial Aid Committee on this record stating that Keith Henderson is stable on current medications and ready to resume school on a part-time basis. [AR 134, 154, 200.] On January 18, Henderson reported to Zellner that he felt much better.  He was upbeat and cheery.  He discussed some grieving and feelings of loss over his father, along with plans for the future. [AR 184.]

On February 24, 2007, Henderson's mother Sandra filled out a third-party function report. [AR 92.] She described Henderson's activities as reading, going to UNM and helping with his son. He had dropped out of UNM in 2006 due to his disability.  He was able to take care of his son and some meal preparation.  He fed and walked the dog. [AR 93.] Henderson could do and work more before his disability.  He was not sleeping well.  His mother was embarrassed to say that Henderson did not groom himself well.  He needed reminders to take care of himself.  The yard was no longer kept up, and his wife did all of the cleaning.  Henderson's mother stated that "for days on end," Henderson did not get out of bed. [AR 95.] His hobbies were basketball and chess, but he did not do as much as he did previously.  He tended to isolate more and withdraw. [AR 96.] He was argumentative and had problems completing tasks and following instructions.  Henderson now had a short attention span and did not deal well with stress.  For years, her son exhibited signs of depression.  Finally, he could not get out of bed and they all had to face the fact that he was not well. [AR 99.]

On March 2, 2007, Henderson filled out an adult function report.  He lived in a house with his family.  He typically got up in the morning, ate breakfast, took care of daily needs, fed his son and saw him off to school, showered, dressed, fed the dogs, took his medications, ate lunch, did

homework, vacuumed, went to appointments as needed, attended classes, ate dinner, spent time with his family and friends, took his medications, and slept. [AR 75-76.] He cared for his son and helped with his homework.  He also helped his wife get through rough moments of bipolar disorder, OCD and PTSD. [AR 76.] Before he had problems, he could work continuously without falling apart. When he was depressed, he had problems with personal hygiene.  If he was hypomanic, he washed a lot.  If he was neither depressed nor hypomanic, his behavior was normal.  Everything depended on what state he was in. [AR 75-79.] He took his medications religiously.  Sometimes, his medications "spaced him out," but the medications and medical care were helping him. [AR 82.]

In Henderson's March 2, 2007 work history report, he stated he was a fast food cashier from 1997-98; he made deliveries for a printing press in 2000; he was a laborer at a jewelry factory from 1992-1996, and was a packer for a game distributor in 1995. [AR 83-85.]

Henderson saw Dr. Hall on March 10, 2007.  Henderson felt like things had gone well over the last month.  There is a notation that is not clear, stating "Disability apt - Reasonable to work – homelessness." [AR 134.]

On March 13, 2007, Dr. Paula Hughson performed a psychiatric evaluation of Henderson for DDS. [AR 177.] This is the clearest narrative description of Henderson's history.  Henderson last worked in 2003 in a work study job at TVI.  His wife received SSI for bipolar disorder and deafness. Henderson took out student loans to attend school. [AR 177.] He stated "Last year I crashed emotionally, just hit a wall and my wife insisted I seek help.  I went to see Dr. Hall and he diagnosed me with Bipolar II in May."  Henderson was not sure what precipitated a severe depressive episode one year ago when he spent two weeks in bed and did not bathe or leave the house.  He reported that he and Dr. Bull (sic?) and the counselor were able to "go back and identify a pattern of moments of great excellence, and moments of complete infunctionality (sic)."  The medications prescribed by

15

Dr. Hall helped "quite a lot." Dr. Hall warned him against taking a full schedule at school or work. He was currently a UNM student, finishing his junior year towards a degree in Graphic Approaches to Education. He moved in and out of times when he felt he could take on the whole world in contrast with worries that he could not support his family. He saw a therapist weekly and Dr. Hall every month. He found counseling helpful. He denied problems driving or being in crowded places. He had friends. He was able to sleep 6 hours a day. He had pretty good energy when he was not depressed. Henderson did homework, played guitar, read, did housework, and cared for his son. [AR 177.]

Henderson's substance abuse history included 1-2 years of heavy drinking after high school when his father kicked him out and he became homeless. He used marijuana during that time, too. He was arrested once for underage driving. He was charged with domestic violence when his wife's mother called the police several years ago after Henderson accidently hit his wife when she shook him and startled him out of a sleep. [AR 178.] Henderson described chronic verbal and physical abuse by his father while growing up. He was a very shy and insecure boy. He did not feel he deserved what ordinary people had. He saw a mental health professional a few times when he was 10 years old because his parents thought something was wrong. He was argumentative and difficult in school. He had a severe episode of depression the year after graduating from high school. When he visited his father 15 years ago, he found explicit photographs of his father engaging in sexual activities with his oldest stepsister. Three years after his father's death, he learned that his father had an incestuous relationship with his younger stepsister for years. He believed his father wanted him out of the house so that Henderson would not know his father was abusing his stepsisters.

Henderson had not had any psychiatric hospitalizations and had never been treated for depression before 2006. In 1999, he once took a knife to his wrist after a teacher at TVI told him

16

he could not help him with financial issues and his wife derided him at home.  He was held under observation for several hours then. [AR 177.]

Henderson's father was "career navy," and later in some type of intelligence work for the government.  Henderson described his father as an alcoholic, braggart, racist and as verbally and physically abusive.  Henderson stated his own son was diagnosed with ADHD and early onset bipolar disorder. [AR 178.] His spouse was diagnosed with deafness and bipolar disorder I. Henderson was beaten when in his late teens.  His parents divorced when he was 11.  He lived with his mother until the 9th grade and then with his father until he graduated from high school.

Dr. Hughson described Henderson's job history as very spotty.  He generally "lasted with places that allowed him to accommodate his schedule."  The longest job held was with a jewelry company at 25 hours a week from 1990 to 1994.  Henderson appeared generally "scruffy."  He was "intrusive, overly apologetic, cloying," and made inappropriate remarks to a person in the waiting room.  Otherwise, he was cooperative and well oriented.  His attention and concentration were good as long as the topic was his own.  He demonstrated rather poor attention or effort on formal tests of cognitive functions. [AR 179.] His medication dosage was unclear as was how he paid for his medications.   There were themes of victimization, and he appeared anxious.   He denied hallucinations.  Henderson described a momentary impulse he had last year when wanted to drive in front of a truck. [AR 180.] His insight was "fair;" he had a longstanding inability to organize himself or make more than a very marginal adaptation to school and society, despite his intelligence. He also had a longstanding history of very dependent relationships and expectations to be taken care of, along with a self deprecating and passive aggressive stance.  Dr. Hughson wondered about atypical form of PTSD.  She found he was competent to manage his own funds.

17

On March 14, 2007, DDS requested medical advise or an assessment of Henderson's current RFC.  The DDS personnel noted the records in the file, including the fact that Dr. Hall's notes were rather illegible. [AR 176.]

On March 15, 2007, Dr. Gabaldon, a non-examining PhD., conducted a mental RFC. Gabaldon did not find any marked limitations in Henderson's mental RFC.  He found Henderson "not significantly limited" in the abilities to remember locations and work-like procedures and to understand very short and simple instructions. [AR 158.] Henderson  was "moderately limited" in the ability to understand and remember detailed instructions.  Henderson was not significantly limited in his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and punctuality, to sustain and ordinary routine without special supervision, and to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. [AR 158-59.]  He was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, to work in coordination to others without being distracted, and to make simple work-related decisions. [AR 158.] With respect to social interactions, Henderson was not significantly limited in the abilities to ask simple questions or request assistance or to maintain socially appropriate behavior.  He was moderately limited in his abilities to interact appropriately with the general public, to accept instructions and response appropriately to criticism, and to get along with coworkers or peers without distracting them.  Regarding his ability to adapt and set goals, etc., Henderson was not significantly limited. [AR 159.]

Dr. Gabaldon wrote that Henderson alleged he was unable to work because of his mental problems but that his assertion of impairment did not appear consistent with the available evidence.

Gabaldon observed that while Henderson reported his depression started about a year ago, he could not explain any cause for the depression. He was responding well to treatment but continued to have some limitations. He was able to care for his personal needs and engage in some household tasks. He was currently in college and did not report severe social problems although he did occasionally have some difficulty "relating." [AR 160.] Gabaldon wrote that Hughson's evaluation did not reveal any indication of a thought disorder, substance use or suicidal intent. "His cognitive ability is inefficient." Gabaldon concluded that Henderson could "understand, remember, and carry out simple instructions, make simple decision, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." [AR 160.]

On the Psychiatric Review Technique form, Gabaldon assessed Henderson for 12.04 affective disorders and 12.08 personality disorders. [AR 162.] He concluded he had bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes [AR 165] and a personality disorder NOS. [AR 169.] With respect to the "B" criteria for listing levels, Gabaldon found Henderson's restriction of activities of daily living was mild, and that his difficulties in maintaining social functioning and maintaining concentration were moderate. [AR 172.]

On March 15, 2007, Henderson's initial application was denied. While he had severe impairments, they were not at listing level. He had moderate but not marked limitations. He was capable of unskilled work. [AR 30, 31, 46.]

On May 4, 2007, Henderson saw Dr. Hall. He had some vertigo and felt like his "feet were going over his head." The progress notes are difficult to read. There were feelings of

"disconnectedness." Henderson was able to cry in the office. He appeared to be discussing feelings about his dad's death. [AR 133, 153.]

On May 10, 2007, Henderson filed a request for reconsideration, stating his medical problems prevented him from working. [AR 44.] The request was denied. [AR 29, 41.] On July 16, 2007, he requested an ALJ hearing.

On July 16, 2007, he filled out a disability report for his appeal. Nothing had changed since his last disability report. He was still seeing Dr. Hall for medication management and was seeing a therapist, although there are no contemporaneous therapy notes as of this date. He continued to take the same prescription medications. [AR 62-65.] On July 18, 2007, he reported to Dr. Hall that he had 2-3 days of dark thoughts. He had read six books. He was having disturbed thoughts, increased energy, insomnia, and racing thoughts. He had joined a rock band and exhibited an elevated mood. He was in a manic state. They discussed the bipolar state. Dr. Hall found Henderson was "mostly stable." [AR 132.]

On August 5, 2007, Dr. Hall saw Henderson. He was sad and struggling to get back into school. The note is difficult to read. [AR 131.] On October 24, 2007, Dr. Hall added Cymbalta to Henderson's medication regimen. [AR 130.]

There is a typed disability report, dated October 30, 2007. Henderson reported that he was having more tactile hallucinations and dark images appearing in his mind. [AR 70.] He had some side effects from his medications, including eye tics, double vision, diarrhea, and memory problems. [AR 72.] He spent a lot of time dreading "what if" types of scenarios, e.g., end of the world, biblical events, or death of family members. [AR 73.]

There is another October 30, 2007 disability report that is slightly different from the other, dated the same day. This report indicates that Henderson could not work because of his bipolar

20

disorder and depression. [AR 109.] He suffered from major depressions that lasted from two weeks to a month, at which time he was "useless." In those times, he could not get out of bed, dress, or take care of his son. He did not want to live then, was suicidal and slept 14 hours a day. While he first became aware of his condition in January 1983, he stopped working in May 31, 2000. [AR 110.]

On November 7, 2007, Henderson saw Dr. Hall. He noted that two weeks ago, he "almost hit a wall." When he was depressed, nothing seemed real. He was having very sinister thoughts. The progress note is partly illegible. [AR 129.]

### *2008 Records*

On March 21, 2008, Henderson saw Dr. Hall. It appears that Henderson stopped taking Cymbalta two months ago because he was disillusioned with the medication. However, after being off the medication, Henderson's depression increased. He was having dark thoughts. [AR 122.] On May 8, 2008, Henderson again saw Dr. Hall. The patient check-in form stated that Henderson was there to adjust medication. There has been no response to the antidepressant. He presented as "flat" and "withdrawn" with occasional "suicidality." "Not an option. He reported that no antidepressant was helpful. Henderson was "sad, weepy, and unhappy." His appetite was poor. He felt anxious and was having hallucinations. [AR 120.] Dr. Hall's progress notes state "depression; fear." "Intense case of mania - sensation of incline like being enclosed in hide away bed." Dr. Hall reported that manic symptoms were only under marginal control. In February, Henderson had stopped taking medications and had cycled into a mixed state of agitation and mania. [AR 121.]

On May 19, 2008, Henderson filled out another "patient check-in form" for Dr. Hall. [AR 119.] He was having problems going to sleep. He was sad, weepy, or unhappy. He was lethargic,

disconnected, and having hallucinations.  Henderson felt numb, dizzy, had tics or twitches and

headaches. [AR 119.] A note on the record states "went over SSI Benefits Disability packet."

On that same date, May 19, 2008, Dr. Hall filled out a Medical Assessment of Ability to Do

Work-Related Activities (Mental).[16] [AR 124.] Dr. Hall found marked limitations in Henderson's

ability to remember locations and work-like procedures, understand and remember very short and

simple instructions.  On the form, "marked" limitations are defined as being "a serious limitation

in this area.  The ability to function is severely limited." [AR 124.] Dr. Hall found that  Henderson

was severely limited in his ability to understand and remember detailed instructions.  The form

defined a "severe" limitation as "a major limitation in this area."  "There is no useful ability to

function in this area.  Limitations preclude any employment not just patient's usual employment."

[AR 124.] With respect to the category of sustained concentration and persistence, Dr. Hall found

severe limitations in Henderson's ability to carry out very short and simple instructions, carry out

detailed instructions and complete a normal workday and workweek without interruptions from

psychological based symptoms, etc.  He found marked limitations in Henderson's ability to maintain

attention and concentration for extended periods, perform activities within a schedule, sustain an

ordinary route without special supervision, and to work in coordination with/or proximity to others

without being distracted by them. [AR 124.]

Dr. Hall commented on this form that Henderson's mood swings were severe and under fair

control.  His ability to understand depended on his depressive states. [AR 124.] With respect to

social interactions, Dr. Hall found Henderson severely limited in his ability to interact appropriately

with the general public and to get along with coworkers or peers without distracting them.  He was

---

[16]At times in the briefing, Plaintiff mistakenly referred to this record with a date of May 2009 instead of
May 2008. [Doc. 15, p. 2.]

markedly limited in his ability to ask simple questions or request assistance, accept instructions and respond appropriately and to maintain socially appropriate behavior. Dr. Hall commented that Henderson had lost jobs because he did not go to work. [AR 125.]

Dr. Hall also found Henderson was severely limited in his ability to travel in unfamiliar places or use public transportation and markedly limited in his ability to respond appropriately to changes in the work place and be aware of normal hazards. He was only slightly or moderately limited in his ability to set realistic goals or make plans independently of others. Dr. Hall wrote that Henderson suffered from "severe recurrent bipolar illness/depression only. Partially responsive to medication and psychotherapy. . . ." [AR 125.]

The definitions of limitations on this form are somewhat confusing. For example, a marked limitation is defined as being _severely_ limited, while a severe limitation is a more major limitation. These definitions are not entirely consistent with the categories of limitations used in DDS forms. In the Mental RFC Assessment, a marked limitation is the highest degree of limitation in contrast with definitions on Dr. Hall's forms, [AR 124] where a marked limitation is less serious than a severe limitation. [_See_ AR 158.]

Dr. Hall also filled out forms for 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). [AR 126, 127.] The forms are confusing. For example, under 12.04, Dr. Hall checked off "depressive syndrome" characterized by anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, thoughts of suicide, paranoid thinking. He did not check off Manic syndrome, but did check almost every category within that syndrome, including hyperactivity, pressure of speech, flight of ideas, inflated self-esteem, decreased need for sleep, easy distractibility, etc. Dr. Hall then noted that these limitations resulted in marked restrictions of activities of daily living, marked difficulties in

23

maintaining social functioning or marked difficulties in maintaining concentration. It is not clear what definition of "marked limitation" is being used here. Dr. Hall also found that Henderson suffered repeated episodes of decompensation, each of extended duration, a residual disease process that resulted in marginal adjustment, and a current history of 1 or more years' inability to function outside a highly supportive living arrangement. Under these categories, Dr. Hall inserted "homeless x2 yrs." [AR 126.]

Essentially, Dr. Hall checked off most or all of the boxes on the 12.06 anxiety disorder form. He found that Henderson suffered from generalized periodic anxiety, accompanied by motor tension, autonomic hyperactivity, apprehensive expectation or vigilance. He exhibited a persistent irrational fear of a specific object, activity or situation which resulted in a compelling desire to avoid the dreaded object. [AR 127.] Dr. Hall inserted "fear son is antichrist." Henderson suffered from recurrent obsessions and recurrent or intrusive recollections of a traumatic experience. Dr. Hall concluded there were marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. He also noted repeated episodes of decompensation. [AR 127.]

Henderson's attorney provide the ALJ with these forms before the hearing on June 12, 2008. [AR 123.] At the ALJ hearing, Henderson appeared with counsel. He testified he was in college and taking nine classes per quarter. He hoped to obtain his degree in May 2009. [AR 222.] He did not drive to school partly because of his anxiety. He had had the temptation to drive off the road before. [AR 223.] He was taking a limited classload based on his doctor's recommendation, who observed that Henderson had "hit the wall" a number of times at school, and rather than doing that again, he should reduce his classload. Henderson did not spend time with his classmates. He went to school and then directly home.

24

He described himself as having trouble with school attendance about 1-2 times a year because he fell into a major depression. He testified that he had just come out of a depression. He tended to cycle up and down with depression and anxiety. [AR 223.] He was still taking the medications Trileptal and Lamictal. The Trileptal helped him sleep but made him feel sluggish. The Lamictal gave him twitches and made him dizzy. He had tried to take Abilify but it affected his kidneys. Henderson took his medications "religiously," which reduced the duration and intensity of his episodes. [AR 226.]

In describing his work, Henderson stated that the jewelry company had allowed him to take off time from work – usually a few weeks at a time. Henderson did not feel he could work full time now. He could handle some work but then "hit a wall." [AR 229.] Regarding his jewelry company work, Henderson operated tumblers and ground jewelry. [AR 229.] He worked 25 hours a week and the company accommodated his need for time off.

The vocational expert testified that a jewelry job was light work, semi-skilled with a SVP of 3. The ALJ presented a hypothetical question to the VE, asking her to assume Henderson had moderate impairments in his ability to function socially in an appropriate manner and that he could not perform work with the public. He also had a moderate limitation in his ability to concentrate thereby preventing him from performing concentrated tasks over an extended time without brief pauses. The VE did not think these limitations would preclude him from performing his PRW. [AR 230, 231.] If he had marked impairments, he would not be able to perform any type of work. [AR 231.]

On September 2, 2008, the ALJ issued an unfavorable decision, noting mild restrictions in daily life activities, moderate limitations in social functioning, moderate difficulties in concentration, and no periods of decompensation. The ALJ concluded Henderson had the RFC to

perform a limited range of work at all exertional levels requiring minimal contact with the public, coworkers and supervisors and not requiring extended periods of concentration and attention without short breaks. [AR 17.] The ALJ did not find Henderson entirely credible. [AR 18.] He specifically stated that while normally he would give "great weight" to Dr. Hall as a treating source, he found Dr. Hall's medical source statement to be inconsistent with the record, especially in view of the letters Dr. Hall wrote supporting Henderson's ability to attend school. Thus, the ALJ gave "little weight" to Dr. Hall's opinion. He further found that the opinion of the psychiatric consultant was more consistent with the record as a whole and gave it "significant weight." [AR 19.] Ultimately, the ALJ determined that Henderson could perform his PRW as a jewelry factory worker. In comparing his RFC to the physical and mental demands of the work, he could perform it. [AR 19.]

On November 19, 2008,[17] Dr. Hall addressed a letter "to whom it may concern." In writing this narrative, Dr. Hall stated he reviewed his own treatment notes, Zellner's therapy notes (with which he concurred) and his own medical assessment of Henderson's ability to do work-related activities. He further stated that he concurred with the consultative examination by Dr. Hughson, dated March 17, 2007. [AR 217.] Dr. Hall, wrote, in part, that the treatment plan of reducing the classload and instituting daily medications "appear[ed] to be a beneficial strategy but Bipolar Disorder is a slippery slope as a significant percentage of Bipolar Disorder II relapse within the first two years."

Dr. Hall also commented that the ALJ who heard Henderson's case in June misquoted Dr. Hall by stating that Dr. Hall wrote Henderson could resume a full academic load. Dr. Hall opined that Henderson will require long term psychotherapy since bipolar symptoms still impact his

---

[17]Plaintiff mistakenly states in the briefing that this 2008 appointment occurred in 2009. [Doc. 15, p. 3.]

functionality despite the medications.  Henderson is not able to perform any type of work on a

sustained basis because of his bipolar disorder and depression since 2006 and throughout Dr. Hall's

current treatment of him. [AR 217-18.] Dr. Hall's letter is discussed in more depth *infra*.

The ALJ did not consider this letter by Dr. Hall.  However, Henderson's attorney submitted

it to the Appeals Council, and it was made part of the record. [AR 3-4, 6.] The Appeals Council

considered the additional evidence but found no basis to change the ALJ's decision.

## II.   DISCUSSION

### A.   Alleged Legal Errors

Henderson argues that the ALJ committed error by failing to give controlling weight to Dr.

Hall, the treating psychiatrist where Dr. Hall's opinion was well supported by substantial evidence

and consistent with the medical record as a whole.  In addition, Henderson contends that the ALJ's

step-four determination that he was capable of returning to his PRW is not supported by substantial

evidence and that the ALJ failed to apply the required legal analysis in accordance with SSR 82-62

and the Tenth Circuit's decision in Winfrey. [Doc. 15, p. 1.]

### B.   Treating Physician Opinions

Under the regulations, the agency rulings, and our circuit law, the ALJ must determine

whether a treating physician's opinion is entitled to controlling weight. Watkins v. Barnhart, 350

F.3d 1297, 1300 (10th Cir. 2003).  If the ALJ concludes a treating physician's opinion is not entitled

to controlling weight, the treating physician's opinion is "still entitled to deference and must be

weighed using all of the factors provided in 20 C.F.R. § ... 416.927."  Id. (*quoting* Social Security

Ruling (SSR) 96-2p, 1996 WL 374188, at *4).

When considering a treating physician's opinion, the Tenth Circuit requires a "level of

specificity [as to the reasons] that is sufficient 'to make clear to any subsequent reviewers the weight

27

the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"

Andersen v. Astrue, 319 F. App'x 712, 717, 2009 WL 886237 (10th Cir. Apr. 3, 2009) (unpublished)

(*citing* Watkins, 350 F.3d at 1300-01).

> . . . an ALJ is not free to simply disregard the [treating physician's] opinion or pick and choose which portions to adopt.  Instead, the ALJ must proceed to a second determination, where the ALJ must both (1) weigh the opinion 'using all the factors provided . . .' and (2) 'give good reasons in the notice of determination or decision for the weight [the ALJ] ultimately assigns the opinion.'
>
> . . . [T]he regulatory factors are: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship . . .; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the [pertinent] area . . . ; and (6) other factors . . . .
>
> Although the ALJ's decision need not include an *explicit discussion* of each factor, . . . , the record must reflect that the ALJ *considered* every factor in the weight calculation.

Andersen, 319 F. App'x at 718 (internal citations omitted) (emphasis in original).

Here, the ALJ placed little to no reliance on the treating physician's opinion stating generally that his opinion was not supported by the record as a whole, and pointing specifically to the letters Dr. Hall wrote to allow Henderson back into the university. [AR 18-19.] The ALJ may also have been influenced by the fact that Henderson is pursuing his studies in higher education and has maintained an impressive grade point average.  Given the burdens and pressures of college, and the need to stay "on task" for the successful completion of a degree, the ALJ may well have thought that Henderson's understanding, memory, and concentration were not significantly impaired. Unfortunately, the Court can only speculate as to the ALJ's reasoning, as the ALJ did not discuss many of the factors set out in Andersen or gave short shrift to those factors.

An examination of the record as a whole shows that on May 19, 2008, Dr. Hall, Henderson's treating psychiatrist found many severe or marked limitations in the categories of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, *i.e.,* as to Henderson's ability to perform work-related activities.  [AR 124-125.] On March 15, 2007, Dr. Gabaldon, the non-examining physician, found moderate limitations in eight categories of mental activities, but no marked limitations. [AR 158-59.]

On March 13, 2007, Dr. Paula Hughson performed a psychiatric evaluation for the Disability Determination Services. [AR 177-181.] Her assessment consists of a five-page narrative report.  She did not fill out any forms listing areas of limitations although she described some limitations.  Based on the history provided to Dr. Hughson, Henderson suffered from depression for years but did not receive treatment until 2006. [AR 178.]

Henderson presented to Dr. Hughson with a "generally scruffy appearance."  She noted he was intrusive, overly apologetic and had a somewhat cloying manner.  Otherwise, he used a normal rate and tone of speech, was cooperative and straight forward and well oriented.  His attention was good as long as the topic was his own.  Dr. Hughson noted that his primary problem appeared to be a "longstanding inability to organize self or make more than a very marginal adaptation to school, society, despite intelligence."

Henderson "might experience mild to moderate difficulties understanding and remembering basic instructions and moderate difficulties concentrating and persisting at tasks of basic work."  He would have "more significant difficulties getting along with others in the workplace due to his personality traits."  He was "significantly affected by his symptoms, personality traits." [AR 180.] Dr. Hughson diagnosed him with Bipolar Disorder II, possible attention deficit disorder, childhood trauma, "rule out post traumatic stress disorder," and personality disorder, not otherwise specified,

"dependent, avoidant, ineffectual."  Dr. Hughson noted Axis IV was "severe: childhood trauma; history of battering; mentally ill wife; coping with his own chronic mental problems; unemployment; finances." [AR 180.] She assessed Henderson with a GAF of 55, noting "serious symptoms and impairment." [AR 180.] These findings are not consistent with an individual who is freely and functionally able to perform in the workplace.

In his written decision, the ALJ noted Dr. Hall's May 2008 medical source statement and the assessment of marked to severe limitations.  The ALJ further observed that Dr. Hall found Henderson's impairment met all of the criteria for the listing of depressive disorder. [AR 18.] The ALJ then briefly commented that while normally Dr. Hall's opinion would merit great weight as a treating source, the "doctor's medical source statement is inconsistent with the record as a whole, especially the letters he prepared so that the claimant could attend school, and is granted little weight.  The opinion of the psychiatric consultant is more consistent with the record as a whole and is granted significant weight." [AR 18-19.]

The ALJ summarized two letters written to UNM at Henderson's request. [AR 18.]  The first is an undated letter, most likely in August 2006, stating that Henderson had been successfully free of a depressive episode for three months.  He was on a stable medication regimen.  His outlook was positive and he had developed coping strategies for recognizing and dealing with depression.  Henderson was confident he could resume a normal academic load.  Dr. Hall added that Henderson was untreated and undiagnosed for 23 years. [AR 139.]

The second is a brief note, dated January 2007, directed to the UNM Financial Aid Committee, stating Henderson was stable on current medications and ready to resume school on a part-time basis. [AR 134.]

As noted *supra*, Dr. Hall wrote a letter on November 18, 2008, concerning Henderson, addressed to whom it may concern. [AR 217.] The ALJ did not see the letter as he had already issued the unfavorable decision in September 2008.  However, the letter was part of the evidence considered by the Appeals Council. [AR 2.]

In the November 2008 letter, Dr. Hall explained that he began treating Henderson in January 2006.  It immediately became apparent to Dr. Hall that Henderson suffered from severe depression and Bipolar II Disorder which were previously undiagnosed and untreated for many years.  As of November 2008, Dr. Hall had seen Henderson 24 times and had monitored and prescribed anticonvulsant and bipolar disorder medications for Henderson.  Upon reviewing his treatment notes, Dr. Hall noted that it was evident Henderson had recurring periods of depression and manic episodes, approximately twice per year, lasting weeks.

Henderson wished to complete his degree at UNM and asked Dr. Hall in August 2006 to write a note to UNM with his current prognosis.  Dr. Hall explained in the 2008 letter that even though Henderson was making great strides in late 2006, Dr. Hall did not think it was advisable for Henderson to take on a full time schedule or to return to work at that time.  However, Henderson felt he was ready to return to school, and Dr. Hall reluctantly agreed to accommodate his patient and write the note to UNM.  As a result, Henderson increased his classes from one-half to a three-quarter classload.  Dr. Hall observed that after returning to school, Henderson reported three sustained bouts of depression, which threatened his status as a student.  Fortunately, his teachers were understanding of his bipolar condition and made accommodations for him missing several weeks of class.  Dr. Hall further opined that since 2006 and throughout Dr. Hall's treatment of Henderson, Henderson had not been able to perform any type of work on a sustained basis because of his bipolar condition and depression. [AR 218.]

31

Dr. Hall's recent letter, that the ALJ did not see, offers an explanation why Dr. Hall agreed to write the letters soft pedaling Henderson's situation.  Had this November 19, 2008 letter been before the ALJ, it is possible that the ALJ might have afforded more weight to Dr. Hall's opinions, rather than no weight at all.

At the ALJ hearing in June 2008, Henderson testified that he continued to take classes towards a degree and was taking nine classes per quarter. [AR 222.] However, Henderson also explained that he was taking a limited classload because of his doctor's recommendation.  His doctor advised that he not take a full load because of his earlier experiences in having "hit the wall" at school. [AR 223.] Henderson described not attending classes during several periods that year because of major depression. [AR 224.]

The Court concludes that remand is required because it cannot meaningfully review the ALJ's decision regarding the weight he assigned to Dr. Hall's assessment of Henderson's limitations.  The ALJ stated he gave Dr. Hall's opinion "little weight" [AR 19], but it is not clear what weight was afforded Dr. Hall's opinion.  Based on the ALJ's decision, it appears that those opinions were rejected out-of-hand.

The ALJ is required to give "good reasons" for the weight assigned to the treating doctor's opinion, which he did not do.  The ALJ relied on two letters Dr. Hall wrote to UNM on behalf of Henderson.  The fact that Dr. Hall wrote a letter to UNM in 2006 stating *Henderson* felt he was ready to return to school does not necessarily contradict Dr. Hall's medical assessment of Henderson's limitations, especially in view of the longstanding doctor-patient relationship he had with Henderson and Dr. Hall's willingness to accommodate a patient's request.  As of late 2008, Dr. Hall had seen Henderson 24 times, had consistently diagnosed him with severe depression, mania,

and bipolar disorders, and had regularly prescribed medications for his conditions. No other health care provider had such extensive contact with Henderson.

From 2006 to 2006, the medical records are replete with Dr. Hall's observations or notations that Henderson had severe recurrent or cyclical depression since 1983, suffered depressive episodes lasting 3 to 5 weeks, was sometimes unable to get out of bed, was unable to attend school on occasions, lost jobs because he did not consistently attend work, had suicidal ideation, looked at a knife and considered hurting himself, suffered days of hypomania, cried in appointment sessions, suffered from dark, disturbing, racing, and sinister thoughts, suffered from mania that was under marginal control, was severely sad, weepy, and unhappy, was anxious and agitated, suffered from hallucinations, and was only partially responsive to medications and psychotherapy. [AR 119, 120, 121, 122, 125, 129, 132, 133, 135, 136, 137, 138, 141, 143, 146, 209.] These records paint a far different picture of Henderson than do the two letters written to the University.

Moreover, the fact that Henderson might have been ready in late 2006 and early 2007 to attend school does not contradict Dr. Hall's diagnoses, treatment, or opinions. It is not clear from the record how long Henderson had been attempting to attain his degree or how long he was able to attend school for any period of time. It is clear, however, that he had started and stopped school on a number of occasions apparently because he could not consistently attend school due to ongoing depressive/manic episodes. [AR 135-cannot get out of bed; AR 198-hiding in bed, cannot write paper that was due at school, history of collapses; AR 143 – GPA of 3.9 at some point, but this term, "washed out" of UNM, TVI rejection in 1998; AR 197 - "attempting" to finish UNM course; AR 194 - working on UNM process; AR 192 - trying to get into UNM; AR 140 - wants letter from doctor to "save academics;" AR 191 - UNM did not allow him to register and he was still trying to get in; AR 190 - did not get permission to enroll in UNM; AR 138 - denied admission at UNM; AR

188 - UNM agreed he could return in January 2007; AR 185 - feels like a failure because he cannot get into school; AR 59 - was in work study program at TVI in 2001-03; AR 134-ready to resume school part-time; AR 92 - dropped out of UNM in 2006 due to disability; AR 177 - currently in junior year at UNM and hoping to finish degree; AR 131 - struggling to get back to school in August 2007; AR 113 - three years of college completed as of 12/2005; AR 223 - taking limited classload because of doctor's recommendation and the number of times he had "hit a wall" when attending school; AR 217-18 - since returning to school, Henderson reported 3 sustained bouts of depression which threatened his status as a student but his instructors were able to accommodate his missing several weeks of class thus far.]

Finally, the fact that Henderson's own teachers allowed him to skip classes when necessary or to accommodate his special needs does not mean that Henderson could function in a work environment. This is true because an employer might not be as sympathetic or accommodating as were Henderson's instructors.

For these reasons, the ALJ's reference to two notes written by Dr. Hall about Henderson's ability to return to school, in some capacity, does not constitute "good reasons" for rejecting Dr. Hall's opinions and affording the physician's opinions so little weight.

The ALJ also stated that Dr. Hall's medical source statement was inconsistent with the record as a whole [AR], but the ALJ did not identify the inconsistencies in the record, other than to mention the two letters written to UNM. In Cagle v. Astrue, 266 F. App'x 788, 794 (10th Cir. Feb. 25, 2008) (unpublished), the Tenth Circuit noted it previously had remanded a case, in part, because "the ALJ failed to explain or identify what the claimed inconsistencies were between [the treating physician's] opinion and the other substantial evidence in the record . . . ." (citing Langley v. Barnhart, 373 F.3d 116, 1122-23 (10th Cir. 2004)). In Cagle, the Tenth Circuit again remanded

because the ALJ failed to identify what the "troubling inconsistencies" were in the doctor's medical records.  Thus, the Court could not meaningly review the ALJ's reasons for the weight assigned to the doctor's opinion.  Id.

Here, the Court discussed *supra* numerous medical records of Dr. Hall's that are consistent with the limitations he found.  The ALJ's brief review of a few of Dr. Hall's medical records is not substantial evidence to support his finding that Dr. Hall's medical source statement is inconsistent with the record as a whole because the ALJ emphasizes only those portions of Dr. Hall's records that tend to support the ALJ's conclusion.  *See* Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir 2004) (*per curiam*) (ALJ not entitled to pick and choose only favorable portions of a medical report/opinion).

For example, the ALJ notes that Henderson first saw Dr. Hall in April 2006, entered counseling, was diagnosed with a mood disorder, prescribed Lamictal and Trileptal, and responded well to the medications, reporting less depression. [AR 15.] This summary of the record omits the many references that medications had not controlled Henderson's mood disorder, that he still suffered from depression and mania, and continued to report suicidal ideation.  The ALJ also comments that Henderson was attending community college and had a 3.9 G.P.A., but there is no discussion of Henderson's failed attempts to complete his classes, the inability to finish assigned papers, or the claim that Henderson "washed out."  So, too, the fact that Dr. Hall agreed to write on Henderson's behalf shows that Henderson was not being allowed to return to college, most likely because of the impact of his depression and disorders.  In a record such as this, where Henderson's attempts to attend school were often frustrated by his diagnoses, it would be important to know when he had the G.P.A. of 3.9 and for how long.

35

The ALJ observed that in August 2006, Dr. Hall noted Henderson was free of a depressive episode for three months. [AR 15.] That note, however conflicts with Dr. Susan Flynn's records of her counseling sessions with Henderson which demonstrate ample evidence that Henderson continued to be depressed in June and July 2006. [AR 194, 195.] On July 20, 2006, Dr. Hall increased Henderson's medications. [AR 193.] On July 27, 2006, Henderson arrived an hour early to his appointment with Dr. Flynn due to feelings of worthlessness and hopelessness. He denied active suicidal ideation but "wished he were not here." [AR 193.] Dr. Flynn was concerned enough to contact Henderson at home that night to check on him. She advised him to call her or 911 if the suicidal ideation returned. [AR 192.] On August 22, 2006, in his face-to-face interview with the SSA, Henderson was observed as being non-functional in the area of concentration. [AR 116.] Again, these are not records demonstrating a patient who has overcome mental and emotional disorders.

In his written decision, the ALJ also may have erred in describing some of the notations in Dr. Hall's records. For example, the ALJ stated Henderson continued in treatment and reported some fleeting depression that responded to Abilify. [AR 15.] While there is a record, dated 9/22/06, that includes the word "fleeting," [AR 203], that record states "OCC suicidal - fleeting moment of," which the Court construes to mean occasional, fleeting moments of suicidal ideation rather than "some fleeting depression." The ALJ may have had the impression that Henderson's depression was "fleeting," based on Dr. Hall's notation. Clearly, however, Henderson's depression is of long standing duration.

Abilify was prescribed for Henderson on this date, but by October 3, 2006, Henderson complained to Dr. Flynn that he suffered from severe headaches on Abilify and stopped taking it. [AR 189.] On November 22, 2006, Dr. Hall indicated Henderson was on Ability and had a rough

36

month.  A couple of moments of depression were noted along with suicidal ideation. [AR 202.] Dr. Hall discontinued Abilify and was considering Lithium.  The medical records give a significantly different description of Henderson than the ALJ's brief and not quite accurate summary of the record.

The ALJ then stated that Henderson continued to see Dr. Hall for treatment and that Henderson had some "fleeting depression and a couple of manic episodes and in May 2008, stopped taking his medications and cycled into a mixed state." [AR 15.] The ALJ failed to cite any medical records to support this summary for this, or indeed, for the earlier notation.

Dr. Hall's May 19, 2008 record states that Henderson had anger problems, anxiety/panic attacks, was sad weepy, and unhappy, and did not have any appetite.  He complained of tics, headaches, dizziness, and numbness.  He was suffering from hallucinations, thoughts of harming others, disconnected feelings and suicidal ideation on one occasion. [AR 120.] Dr. Hall observed that he did not have a response to the antidepressant.  He appeared flat and withdrawn.  There was suicidal ideation but Henderson did not have a plan.  "No antidepressant is helpful."  "Can't do laundry, cook." [AR 120.]

On May 8, 2008, Dr. Hall noted depression and fear and an intense case of mania. Henderson described feeling like he was being enclosed in a hideaway bed.  He had symptoms of mania, which Dr. Hall described as being only under marginal control.  In February, Henderson stopped taking his medications and cycled into a mixed state, where he was agitated, manic, and reckless. [AR 121.] However, it appeared by March, he was again taking his medications.

Again, the actual medical records are not consistent with the ALJ's brief summary of some of the records.

In addition, while the ALJ is not required to expressly apply in his decision each of the six factors set forth in 20 C.F.R. § 404.1527, when assessing the weight to give an medical opinion, the decision must "reflect that the ALJ *considered* every factor in the weight calculation."  The ALJ's decision does not reflect that he considered every factor under § 404.1527 in the weight he assigned to Dr. Hall's opinion.  For example, the ALJ easily could have noted the longstanding and regular treatment Henderson received from Dr. Hall – 24 visits over a two-year period and that Dr. Hall was a specialist in the area of adult psychiatry.  The ALJ failed to reflect the degree to which Dr. Hall's opinion was supported by relevant evidence and the consistency between the opinion and the record as a whole.

Further, the ALJ did not note other portions of Dr. Hall's records that contradicted the letters written to UNM on Henderson's behalf.  While Dr. Hall may have written the note suggested by Henderson in August 2006, Dr. Hall stated on September 22, 2006 that Henderson needed a year of stability and that Dr. Hall advocated for six months to one year of stabilization before Henderson was released to return to work. [AR 137.]

Dr. Hughson's psychiatric evaluation of Henderson, upon which the ALJ did rely [AR 19], was consistent, to some extent, with Dr. Hall's opinions.  Dr. Hughson noted reports of a suicide attempt in 1999 and suicidal ideation in 2006, but that Henderson had not been treated for his conditions until 2006.  Dr. Hughson opined that Henderson was unable to make more than a very marginal adaptation to school or society, despite his intelligence. [AR 180.] She found he had severe symptoms and impairment, chronic mental problems, and "more significant difficulties" getting along with others in the workplace due to his personality traits.  He was "significantly affected by his symptoms, personality traits." [AR 180.]

38

The Court concludes that the ALJ's explanation for the weight given to Dr. Hall's opinions is legally insufficient.  This does not imply that the Court believes Dr. Hall's opinions support a finding of disability in this case.  That is a decision left to the ALJ on remand.  The Court simply finds that the ALJ did not provide "good reasons" for essentially disregarding the treating physician's opinions about Henderson's limitations.

Based on the decision to remand, the Court does not address Henderson's other allegation of error as to the RFC determination.  The ALJ's re-evaluation of the treating physician's opinion may affect the RFC findings on remand.

**III.    RECOMMENDATION:**

The Court recommends that this case be remanded to the Commissioner for additional administrative proceedings, as described herein.

*Lorenzo F. Garcia*
_____
Lorenzo F. Garcia
United States Magistrate Judge